**JONATHAN WOODNER CO. et al., Appellants,**

v.

**AETNA INSURANCE COMPANY.**

No. 23539.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1970.

Decided Jan. 11, 1971.

Petition for Rehearing Denied Feb. 12, 1971.

---

J. Skelly Wright, Circuit Judge, dissented and filed opinion.

Mr. Ralph N. Albright, Jr., Washington, D. C., with whom Mr. Paul L. O'Brien, Washington, D. C., was on the brief, for appellants.

Mr. Edward C. Donahue, Rockville, Md., with whom Mr. E. Gwinn Miller, Rockville, Md., was on the brief, for appellee.

Before WRIGHT, TAMM and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

This is an appeal from an order entered on July 1, 1969, by the United States District Court for the District of Columbia granting a judgment in favor of the defendant, Aetna Insurance Company.[1] The order was entered pursuant to the trial judge's written findings of fact and conclusions of law based on two days of trial, affidavits and briefs. Since counsel has not objected to the trial court's findings of fact and since we find no error in the conclusions of law, we would affirm.

This is an action against Aetna for the recovery of insurance premium refunds, that is, unearned premiums on insurance policies cancelled prior to their expiration date. The plaintiffs are corporations primarily engaged in operating and maintaining apartment hotels and other properties for lease. The various plaintiffs obtained insurance policies covering the properties owned by them through the Washington Insurance Agency, Inc. (hereinafter "WIA"). WIA is not a party to this action, but at all times pertinent hereto was the gener-

---

[1] The Aetna Insurance Company was the insurer on all insurance policies involved herein and will hereafter be referred to as either "Aetna" or "the insurer."

al agent of Aetna as well as of other insurance companies. Under the agency contract between them, WIA had the power to sign and issue binding insurance contracts for Aetna. WIA placed plaintiffs' insurance with Aetna as well as with other insurance companies it served. Plaintiff, Jonathan Woodner Company (hereinafter "Woodner"), as parent corporation of the other plaintiffs, agreed to be responsible for all insurance premiums due on policies issued to the other plaintiffs. The Aetna policies about which this suit is centered were issued during the period from 1963 to 1966 and each contained a provision that in the event of cancellation prior to the expiration date, the paid premium allocable to the unexpired term would be refunded. During the period March 1, 1966 to June 10, 1966, all of the subject policies were cancelled, the gross unearned premiums thereon totaling $20,329.57.

WIA had handled exclusively all of the insurance needs for the properties of plaintiff Woodner located in the Metropolitan area. Throughout the greater part of their business relationship, WIA maintained for this company what is known as an "open account," which account was later enlarged to include all transactions with WIA of each of the other plaintiffs. The account related to insurance purchased from various companies including Aetna. The mentioned "open account" worked in the following manner. The premiums paid to Aetna and other insurance companies by WIA for policies for plaintiffs would be entered in the open account as debits. Sums received on account of plaintiffs' policies were entered by WIA in the open account as credits. When policies were financed through a bank and the bank sent its check to WIA to cover the premiums, the amount of the check went in the open account as a credit. Under invoice agreements the insured, as security for the loan, assigned to the bank the return premiums on the policies so financed up to an amount sufficient to satisfy the unpaid balance under the in-

voice agreements. Whenever policies were cancelled and unearned premiums (which had not been assigned) were refunded, the amount of these premiums would be entered as a credit in the open account.

On March 10, 1966, Mr. Lewis Rowen, the Controller and Secretary of Woodner, telephoned Mr. Rosenberg of WIA and advised him that in the future a Mr. Matarasso would be handling all the Woodner properties regarding insurance. A week later, Mr. Matarasso visited WIA and discussed the matter of cancellation of current policies. Mr. Matarasso did not give WIA definite information as to the effective date of cancellation, it being understood, however, that Matarasso wanted to get binders giving temporary insurance coverage before the current policies were cancelled. In the following weeks WIA received binders covering some of the policies and correspondence from Matarasso advising that other binders were on their way to WIA. On April 21, 1966, WIA received a one paragraph letter dated April 20, 1966, written by Mr. Rowen which stated: "We have appointed the firm of A. Matarasso & Co., Inc. as our insurance agents for all properties previously handled by you." By early June, all policies which had been placed by WIA for the plaintiffs had been cancelled. The full amount of unearned premiums which are the subject of this suit had been refunded by Aetna to WIA. WIA added to the refunds the amount of its unearned commissions allocable to the unexpired period, and credited the open account with this gross amount. A final account, dated June 15, 1966, was rendered by WIA to plaintiffs, which account shows all disbursements and all credits made in connection with the cancellation of these policies.

In a letter to Aetna, dated June 28, Mr. Rowen listed the Aetna policies, which are the subject of this suit, and requested that the unearned premium refunds thereon be sent directly to plaintiffs. Aetna replied to Mr. Rowen in a letter dated June 29, 1966, inform-

ing Mr. Rowen that Aetna did not deal directly with its insured, and assuring him that the matter had been turned over to Aetna's agent, WIA. At no time did plaintiffs direct WIA to return the unearned premium refunds to the plaintiffs and not to apply them to the open account. Aetna had never dealt directly with plaintiffs in the past with respect to receiving orders for insurance and refunding unearned premiums upon cancellation of policies. In fact, WIA maintained an "open account" for the insureds throughout the greater part of this twenty-year business relationship. Prior to June 28, 1966, there was no communication from plaintiffs to Aetna requesting that unearned premiums be returned directly to plaintiffs and not to WIA.

The plaintiffs' main contentions on appeal are twofold. First, the plaintiffs contend that they had expressly terminated their relationship with WIA more than three months prior to complete remittance of the unearned premiums by the insurer to WIA.[2] Because the purported agency relationship between WIA and the insured was terminated, they argue, WIA had no authority to receive the premium returns on June 9, 1966. It is asserted that since WIA was a general policy-writing agent for Aetna, the knowledge of this agency termination is appropriately imputable to Aetna, the principal. Before we mention the plaintiffs' second contention we will deal directly with their first argument.

▮ Although it is quite agreed that WIA no longer had authority to purchase insurance policies for Woodner, it seems evident that WIA was expected to cancel the policies with Aetna. Mr. Rowen's March 10, 1966 telephone call to Mr. Rosenberg advising him that a Mr. Matarasso would be handling all the Woodner properties regarding insurance, the subsequent conversation between Rosenberg and Matarasso at which time Rosenberg was told to cancel their policies as soon as they received binders (Rosenberg Tr. 65), and the April 20, 1966 letter written by Mr. Rowen naming A. Matarasso & Co., Inc. as their "insurance agents for all properties *previously handled* by [WIA]" (emphasis added), indicate very strongly that WIA was·to arrange for the cancellation of the policies. Inasmuch as WIA was to cancel these policies, it could be assumed, unless there were contrary instructions, that the cancellation and refunding of unearned premiums were to be handled as they had been the past twenty years. At no time prior to June 28, 1966 did plaintiffs direct anyone to return the unearned premium refunds to the plaintiffs and not to apply them to the open account. Plaintiffs were in contact with WIA throughout the months in which these cancellations were being effected. Plaintiffs had ample opportunity to instruct WIA regarding the unearned premium refunds which would be forthcoming from the policies to be cancelled. In the absence of directions from plaintiffs in regard to these unearned premiums Aetna and WIA handled the cancellation and refunds as in the past. All such handling had been completed prior to plaintiffs' June 28, 1966 letter to Aetna in which plaintiffs made their initial request that

---

**2.** Judge Wright in dissenting. however, seems to rely quite heavily on an alleged "dispute" in the open account, which he claims to be of such a nature as to influence Woodner in terminating its relationship with WIA. There is absolutely no evidence to support this claim. Mr. Rowen testified that Woodner changed its agency simply as "a matter of economy and efficiency." (Rowen Tr. 44.) This "dispute" seems at best minor. Rowen, himself. characterized it as "actually no dispute in that there had been a meeting of the minds for some fifteen years." (Rowen Tr. 35.)· Plaintiffs offered no documents to show errors in the open account, though Rowen claimed there were such documents. (Rowen Tr. 23.) Plaintiffs' attorney agreed that the open account accurately reflected all of the unearned premiums which plaintiffs sought to recover from Aetna. (J.A. 11.) At any rate since this "dispute" was not before the District Court for determination (J.A. 10), we do not see how it can play any part in this proceeding.

refund checks be sent directly to them. Thus, even *if we impute the knowledge* of WIA to Aetna, plaintiffs would still be estopped from asserting that premium refunds have not been returned to them by Aetna, as the procedure used was a continuation of a long course of conduct and uninterrupted custom adopted by WIA and plaintiffs. *See* Goodman v. Dicker, 83 U.S.App.D.C. 353, 169 F.2d 684 (1948).

■ The plaintiffs' second contention is based on their interpretation of D.C. Code § 35–1334 (1967) which provides in pertinent part:

Any policy-writing agent or salaried company employee authorized by any company to solicit, negotiate, bind, write, or issue policies or applications therefor shall, in any controversy between the insured or his representative and the said company, be held to be the agent of the company which issued or effected the policy solicited or so applied for, *anything in the application or policy to the contrary notwithstanding.* (Emphasis added.)

Any payment made by or on behalf of the insured to any broker for policies issued to such broker for delivery to the insured or issued directly to the insured on the order of such broker, shall, in controversies between the insured and the company, be deemed to have been paid to the company.

The plaintiffs read this provision in the Code to say that the policy-writing agent may be the agent *only* for the insurer, thereby excluding any possibility of a dual agency relationship whereby WIA could be an agent for *both* the insured and the insurer. Thus, they would say, the return of the unearned premiums to WIA is merely a payment to their own agent and is not payment to an agent of the insured. We can see in this statute no intention of Congress to abolish the *concept of dual agency* that is prevalent in many jurisdictions. American Eagle Fire Ins. Co. v. Burdine, 200 F.2d 26 (10th Cir. 1952); Indemnity Ins. Co. v. Midwest Transfer Co., 184 F.2d 633 (7th Cir. 1950);

Home Ins. Co. v. Campbell Mfg. Co., 79 F.2d 588 (4th Cir. 1935). In fact very recently our own District of Columbia Court of Appeals recognized the dual agency concept. Adkins & Ainley, Inc. v. Eli Busada, D.C.App., 270 A.2d 135 (1970). If Congress had wished to avoid this popular concept, it could easily have created the statute to read that any policy-writing agent shall be considered the agent of the company *exclusively.* Ohio had adopted this type of statute with respect to soliciting agents for life insurance companies. It provides in pertinent part, "[A]ny person who solicits * * * shall in any controversy * * * be considered the agent of the company and *not the agent of the insured."* Ohio Rev.Code § 3911.22 (1953), (Emphasis added.) It is significant to note that Ohio does not have this negative limitation in a separate statute dealing with soliciting agents for non-life insurance companies. It is provided there that "[a] person who solicits * * * shall be considered as the agent of the * * * company * * *." Ohio Rev.Code § 3929.27 (1953). This variation in the statutes seems to indicate an intention of the Ohio legislature to expressly forbid the concept of dual agency in life insurance transactions but leave open the possibility for such a relationship in non-life insurance transactions. Furthermore, Wisconsin has interpreted a statute very similar to the District of Columbia's as not precluding a solicitor from acting as agent of the insured in some circumstances. John R. Davis Lumber Co. v. Hartford Fire Ins. Co., 95 Wis. 226, 70 N.W. 84 (1897).

We believe it is also significant that the italicized portion of D.C.Code § 35–1334 set forth heretofore is substantially limited in its latitude by the limiting clause "anything in the application or policy to the contrary notwithstanding." The obvious purpose of this provision is to protect the insured, or his representative, from the "small print" pitfalls which in an earlier age were the subject of far-reaching dissatisfaction to the

several courts and legislative bodies. We are unable to conclude from any legislative history or recorded cases that this Code provision was designed to govern, apply to, or vary, merely upon its invocation, a pattern of business relationships which had existed for some twenty years. An effort to stretch this concise statutory provision into an all inclusive and absolute mandate governing situations neither enumerated or ing situations neither enumerated nor simple to the simply absurd.

It is quite obvious that WIA was acting in a dual role as an agent not only to the insurer, but also to the insured plaintiffs as their "broker." A "broker" in the insurance field is defined in D.C. Code § 35–1303 (1967) as:

> * * * [A]ny person who for a consideration acts or aids in any manner in the solicitation or negotiation on behalf of the assured of contracts of insurance, surety, or indemnity.

WIA certainly meets the requirements of this definition. It purchased insurance for the plaintiffs not only from Aetna but other insurance companies as well. WIA even went so far as to procure for the plaintiffs financing arrangements through banking institutions. To keep these dealings with the various companies as free from complication as possible WIA ran a single "open account" for the benefit of the plaintiffs not Aetna.

█ When Congress enacted the first paragraph we referred to from D.C.Code § 35–1334 (1967), it most rightfully wished to protect the insured from the insurance company's agent, whose propensity to honesty and reliability has been evaluated by only the insurer and whom the insured can neither hire nor discharge. We feel by enacting the subsequent paragraph of § 35–1334 Congress showed less eagerness to protect the insured when his own broker was involved in a controversy, for in that case the statute offers protection to the insured only in the limited circumstances when the insured has paid money to the broker for requested policies. Appar-

ently Congress felt that when an insured's interests are being represented by one of his own choosing he needs only limited protection. WIA was the "broker" chosen by the plaintiffs to purchase insurance for their various properties. WIA had been authorized for twenty years to collect unearned premiums for the plaintiffs. It was keeping the "open account" as an efficient method of bookkeeping for the plaintiffs and not for Aetna. With the facts as they are, we must consider WIA a policy-writing agent *and* a "broker." As payment to one's insurance broker is payment to the insured, Kaufman v. McLaughlin Co., 123 U.S.App.D.C. 92, 357 F.2d 283 (1966), 6 Couch on Insurance 2d § 34:102 (1961), we rule that the plaintiffs were properly paid by Aetna and the judgment of the District Court is affirmed.

Affirmed.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

As the majority opinion indicates, appellants maintained an open account with Washington Insurance Agency with respect to premiums on their policies. A dispute arose as to the amount owed WIA on the open account and appellants, because of this dispute as well as for other reasons, decided to replace WIA, who was also the general agent of Aetna Insurance Company, as their insurance agent and cancel all insurance placed by WIA with Aetna and other insurers in their behalf. WIA was advised of this decision orally on March 10, 1966. It was confirmed by letter April 20, 1966, after binders for replacement insurance had been obtained by appellants' new agent. Appellants' letter to WIA stated:

> "We have appointed the firm A. Matarasso & Co., Inc. as our insurance agents for all properties previously handled by you."

On June 9, 1966, Aetna returned the unearned premiums totaling $20,329.59 on appellants' cancelled policies, not to appellants, but to Aetna's general agent,

WIA. WIA, instead of forwarding the money to appellants, credited it to the disputed open account with the assured it no longer represented. When appellants demanded that Aetna return the unearned premiums directly to them, Aetna replied that the matter had been turned over to Aetna's agent, WIA. Thus Aetna favored its own agent in WIA's dispute[1] with Aetna's assured by paying the returned premiums on appellants' policies to WIA rather than appellants. How this payment under the circumstances to WIA can liquidate Aetna's indebtedness to appellants is a mystery to me.

The majority states: "[E]ven if we impute the knowledge of WIA to Aetna, plaintiffs would still be estopped from asserting that premium refunds have not been returned to them by Aetna, as the procedure used was a continuation of a long course of conduct and uninterrupted custom adopted by WIA and plaintiffs." But the long course of conduct and uninterrupted custom had ended long before Aetna sent the money to WIA. At that time Aetna's agent WIA was no longer the agent of appellants.

Perhaps principles of estoppel might be properly invoked to protect Aetna, if Aetna were unaware of the changed circumstances. But here WIA is Aetna's agent, and it is of course elementary, as the majority indicates, that in law notice to the agent is notice to the principal. And in the circumstances of this case it is difficult to believe that in fact Aetna did not know precisely what it was doing. Aetna's purpose to protect its agent, WIA, continued right through the trial. At no time did Aetna attempt to bring in WIA as a third party defendant to reclaim from WIA the returned premiums in the event the court held that payment should have been made to the assured on the policies. Indeed, even on this appeal no suggestion in this direction is made.

In my judgment it is situations like the present one which prompted Congress to enact 35 D.C.Code § 1334 (1967).[2] Congress wanted to make certain so far as possible that an insurer and its agent could not join hands to defeat the rights of an assured.

I respectfully dissent.

1. The majority in footnote 2 suggests that the dispute concerning the open account "seems at best minor." Mr. Rosenberg, president of WIA, testified that after crediting the open account with the returned premiums Woodner still owed WIA $9,142.93. Strangely, he could not give a reason why no action to collect this amount has been taken. Mr. Rowen, comptroller and secretary of Woodner, testified as to the open account:

Q * * * Would you tell us what the account rendered and carried over from May 31, 1966 appears to be?
A $26,920.50.

Q Now, is that an accurate reflection of the amounts due and owing by the Woodner companies to the Washington Insurance Agency?
A It most certainly is not.

Q Showing you Defendant's Exhibit Number 7, looking at their statement dated February 26, 1965, would you tell us the balance due and owing as stated on this statement of February 11, 1965?
A $42,100.83.

Q Was that an accurate reflection of the amounts due and owing by Woodner Company to Washington Insurance Agency?
A It was not.

Q Did you make known your disagreements with the balance due as carried forward in these statements over a period of years?
A I did.

Q And to whom did you make known this disagreement?
A To Mr. Rosenberg and Mr. Taylor.
Q Who was Mr. Taylor?
A Mr. Taylor was at one time Mr. Rosenberg's associate.
Q Did you have a discussion with them about this matter?
A Yes, on more than one occasion.

2. See page 758 of the majority opinion for text of the statute.