In re **NORTHEAST DAIRY COOPERATIVE FEDERATION, INC., Debtor.**

**NORTHEAST DAIRY COOPERATIVE FEDERATION, INC., Plaintiff,**

v.

**DELLWOOD FOODS, INC., Eastern Milk Producers Cooperative Association, Inc., Sunnydale Farms, Inc., Thomas A. Wilson as Market Administrator, John R. Block, U.S. Secretary of Agriculture, Canajoharie Cooperative Milk Producers, Inc., Poland Milk Producers Cooperative Dairies, Inc., Schoharie County Cooperative Dairies, Inc., and Hershey Foods Corporation, Defendants.**

Bankruptcy No. 85–00721.
Adv. No. 85–0084.

United States Bankruptcy Court,
N.D. New York.

March 11, 1987.

**666**

Hancock & Estabrook, Syracuse, N.Y., for debtor; Donald J. Kemple, of counsel.

Botein, Hays & Sklar, New York City, for Dellwood Foods, Inc.; James Altman, of counsel.

Williams, Micale & Wells, Syracuse, N.Y., for Eastern Milk Producers Co-op. Ass'n, Inc.; Peter N. Wells, of counsel.

Moses & Singer, New York City, for Sunnydale Farms, Inc.; David Rebinowitz, of counsel.

Frederick J. Scullin, Jr., U.S. Atty., N.D. N.Y., Syracuse, N.Y., for Thomas A. Wil-son, Market Adm'r; William H. Pease, Asst. U.S. Atty., of counsel.

Kevin F. Meckus, Dept. of Agriculture, Washington, D.C., for John R. Block, U.S. Secretary of Agriculture.

McPhillips, Fitzgerald, Meyer & McLeni-than, Glens Falls, N.Y., for Canajoharie Co-op. Milk Producers, Inc. and Schoharie County Co-op. Dairies, Inc.; James D. Horowitz, of counsel.

Walter G. Pratt, Utica, N.Y., for Poland Milk Producers Co-op. Dairies, Inc.

Finkel, Goldstein & Berzow, New York City, for Hershey Foods Corp.; Kevin J. Nash, of counsel.

Menter, Rudin & Trivelpiece, P.C., Syracuse, N.Y., for Creditors' Committee; Peter L. Hubbard, of counsel.

MEMORANDUM–DECISION, PROPOSED FINDINGS OF FACT, PROPOSED CONCLUSIONS OF LAW, AND PROPOSED ORDER PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 7056

STEPHEN D. GERLING, Bankruptcy Judge.

On August 30, 1985, Northeast Dairy Cooperative Federation, Inc. ("Nedco") commenced a voluntary bankruptcy case under Chapter 11 of Title 11 of the United States Code ("Code") by filing a petition in the United States Bankruptcy Court for the Northern District of New York. On November 15, 1985, Nedco, as debtor-in-possession, filed its complaint to compel turnover of property pursuant to Code § 542, and Fed.R.Bankr.P. 7001(1). Nedco sought an order directing Dellwood Foods, Inc. ("Dellwood") to pay over the sum of $1,940,628.32, together with interest thereon. Named as additional defendants were Eastern Milk Producers Cooperative Association, Inc. ("Eastern"), Sunnydale Farms, Inc. ("Sunnydale"), Thomas A. Wilson as Market Administrator and John R. Block as United States Secretary of Agriculture, (collectively, "Market Administrator"), Canajoharie Cooperative Milk Producers, Inc. ("Canajoharie"), Poland Milk Producers Cooperative Association, Inc. ("Poland"),

Schoharie County Cooperative Dairies, Inc. ("Schoharie"), and Hershey Foods Corporation ("Hershey"). At the time Nedco commenced the adversary proceeding, all the foregoing entities were also parties to an interpleader action commenced by Dellwood in the United States District Court for the Southern District of New York ("Southern District interpleader action").[1]

On February 18, 1986, Nedco moved for summary judgment against all defendants. As usual, this action precipitated similar motions from the majority of the defendants, most of which assert cross-claims against Dellwood. Dellwood seeks summary judgment on counterclaims and cross-claims concerning payment responsibility for milk deliveries received by it, and looks to discharge further liability for the contested funds. Dellwood also seeks to join Citicorp Industrial Credit, Inc. ("Citicorp") as a party defendant. All motions were consolidated for hearing on April 29, 1986, with the matter submitted for decision on June 5, 1986. The Court's review of the affidavits and other evidence submitted by the parties reveal certain material facts to be uncontested, and the following is issued pursuant to Fed.R.Bankr.P. 7056.

### FINDINGS OF FACT

Nedco is a cooperative corporation organized and existing under the laws of the State of New York.

In May and June of 1985, Nedco was engaged in the business of buying and selling milk. As part of this business, Nedco sold milk to Dellwood pursuant to a written contract between these parties. Dated January 5, 1982, this agreement provided that Nedco would sell to Dellwood, and Dellwood would buy from Nedco, raw milk for Dellwood's business of processing, packaging and distributing fluid milk and cream. Under this contract, Nedco agreed to deliver the raw milk to designated Dellwood production plants pursuant to weekly schedules set by Dellwood. Also on that date, these parties entered into an agreement providing for the transportation of the milk purchased under the prior contract. Both agreements were in full force and effect in May and June of 1985.

Nedco billed Dellwood for certain milk sold and delivered in May and June, 1985. May milk was sold for a total of $2,712,529.23. Of this amount, Dellwood paid Nedco $1,269,510.61; as Nedco owed Dellwood $114,867.53 for transportation of the May milk pursuant to the transportation agreement, the net amount due Nedco for May milk was $1,328,151.09. June milk was sold for a total of $925,701.85. From this amount, $46,075.63 was deducted for transportation expenses, with a net due Nedco for June milk sold of $879,626.22. The total net due was $2,207,777.31.

During these months, Nedco was also purchasing milk *from* Dellwood. When the totals for these milk purchases ($173,314.95 and $93,874.19 for May and June, 1985, respectively) are subtracted from the total due on the Nedco to Dellwood sales, the result is $1,940,588.17. During the course of the Southern District interpleader action, Dellwood acknowledged an obligation to Nedco in an amount of $1,940,628.32. ($40.15 more than Nedco's figures).

In May and June of 1985, Nedco purchased milk (which it in turn sold to Dellwood) from three primary sources; cooperative organizations which were then members of Nedco, cooperatives which were not members of Nedco, and other proprietary dealers in milk. In addition to the defendants other than Dellwood, Nedco purchased milk from thirteen member cooperatives, and one non-Nedco cooperative; it in turn sold this milk to Dellwood. These fourteen non-party cooperatives have generally not been paid by Nedco for certain of the purchases made.

During the months of May and June, 1985, Dellwood would provide Nedco with a weekly estimate of Dellwood's milk requirements, and also scheduled the quantities of milk which it needed in the upcoming week. In response, Nedco would pur-

---

**1.** *Dellwood Foods, Inc. v. Northeast Dairy Cooperative Federation, Inc., et al,* 85 Civ. 4938 (CLB) (S.D.N.Y.).

chase the milk from its suppliers, and direct those suppliers to have available the quantities of milk necessary to meet Dellwood's requirements. After reviewing Dellwood's expected needs, Nedco would make arrangements with milk haulers, including Dellwood, and inform them of the place and time at which the milk could be picked up from the suppliers. The milk was then picked up by the haulers, and delivered to Dellwood processing plants in Copaigue, Yonkers, Fraser, and New York, New York, as well as Wallington, New Jersey. Less than one-half of the milk was transported by Dellwood pursuant to its contract with Nedco.

Nedco billed Dellwood directly for the milk sold and delivered to the latter in May and June, 1985. Dellwood also paid Nedco in full for milk it purchased in April, 1985, with this payment made prior to May 19, 1985. On or about June 5, 1985, Dellwood made the referenced partial payment for June milk.

During all relevant times, the buying and selling of the milk was regulated pursuant to the Federal Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C.A. § 601, et seq. (West 1980, Supp. 1986) ("Act"). In particular, the May and June sales were regulated by federal milk marketing regulations promulgated by the United States Department of Agriculture. See General Provisions of Federal Milk Marketing Orders, 7 C.F.R. §§ 1001.1–1001.7 (1986), and Milk in New York-New Jersey Marketing Area, 7 C.F.R. §§ 1002.-1–1002.500 (1986) ("Order No. 2"). Additionally, certain provisions of New York State law were relevant to the transactions. See N.Y.Agric. & Mkts. Law, Art. 21, §§ 252–258aa (McKinney Supp.1987).

Nedco's shaky financial condition, rumored throughout the dairy industry prior to its bankruptcy filing, caused certain of the defendants to make direct claim against Dellwood for portions of the monies due for the May and June, 1985 deliveries. The conflicting claims led to Dellwood's filing of the Southern District interpleader action.

For clarity's sake, the uncontested material facts germane to each defendant, as well as the nature of its cross-claim and/or counterclaim where appropriate, are set forth below.

CANAJOHARIE

Canajoharie is a dairy cooperative organized and existing pursuant to Article 8 of the New York Cooperative Corporation Law (McKinney 1951, Supp.1987). Prior to April 1, 1985, Canajoharie had been a member cooperative of Nedco. On April 1, 1985, Nedco and Canajoharie entered into an affiliate membership agreement, which Canajoharie claims superceded a prior marketing contract of the parties entered into in June, 1978. Whether or not this earlier marketing agreement was displaced by the latter contract of these parties, it is undisputed that in May and June, 1985, Nedco determined which customers would receive Canajoharie milk, Nedco directed haulers to pick up Canajoharie milk on its behalf, and Canajoharie milk was intermingled with milk of other Nedco suppliers prior to sale. Canajoharie did not decide or choose which of Nedco's customers were to receive its milk, and a portion of its milk was delivered to Dellwood, as well as other Nedco customers.

In May, 1985, Nedco purchased 3,711,638 pounds of milk from Canajoharie at a total price of $446,005.22; after deductions for hauling charges ($8,441.67) and other miscellaneous items ($9,650.29) were made, the net due Canajoharie from Nedco was $427,-913.26. In June, 1985, Nedco purchased 1,609,265 pounds of milk from Canajoharie at a total price of $186,521.59; similar deductions as set forth above ($5,163.12 and $4,184.17, respectively) left a net price due Canajoharie from Nedco of $177,174.30. Hence, a total net amount of $605,087.56 remains unpaid by Nedco and due Canajoharie. Nedco sold approximately 1,212,644 pounds of Canajoharie milk to Dellwood during May and June, 1985 (out of the more than 25,000,000 total pounds sold); because of differentials involved in computing a segregated price under Order No. 2, an exact value cannot be placed on the Canajoharie milk. Yet, of the total amount

of milk purchased by Nedco from Canajoharie during May and June, 1985, approximately 22.8% was sold to Dellwood during these months; 22.8% of the net price of the May and June milk purchased by Nedco from Canajoharie amounts to $137,900.60. Canajoharie has not made claim against those Nedco customers who received the remaining 77.2% of its May and June, 1985 milk, nor does it claim that those Nedco customers should pay it directly for this milk.

Canajoharie has asserted a cross-claim against Dellwood, alleging that since it merely consigned milk to Nedco, Dellwood has been unjustly enriched by its failure to pay Canajoharie. Canajoharie has moved for summary judgment on its counterclaim, and opposes Nedco's motion for such relief.

SCHOHARIE

Like Canajoharie, Schoharie is a dairy cooperative organized in July, 1939 pursuant to Article 8 of the New York Cooperative Corporation Law (McKinney 1951, Supp.1987). Prior to April 1, 1985, Schoharie had been a member cooperative of Nedco; on May 1, 1985 Schoharie entered into an Affiliate Membership Agreement with Nedco. Schoharie argues this agreement superceded a marketing agreement entered into with Nedco in June, 1978, but in any event, it was Nedco, not Schoharie, which 1) determined which Nedco customers would receive Schoharie milk; 2) directed haulers to pick up the milk on its behalf; and 3) intermingled Schoharie milk with that of other Nedco customers.

Nedco purchased a total of 7,703,359 pounds of milk from Schoharie in May and June, 1985. Deductions similar to those made for Canajoharie milk purchases were made from a total sales price of $922,300.07, leaving a total net of $878,172.40 due Schoharie from Nedco. Of the total pounds of milk Nedco purchased from Schoharie in May and June, 1985, 1,228,152 pounds (15.9%) was sold by Nedco to Dellwood. 15.9% of the total milk sold by Nedco to Dellwood has a value of $139,629.41.

Schoharie has not made claim against the other Nedco customers which received 84.1% of its May and June milk, nor has it ever sought direct payments from those customers. In the Southern District interpleader action, Schoharie asserted that Nedco accepted its milk, that Nedco is indebted to it, and that Nedco, not Dellwood, was billed for all milk sold.

Schoharie's cross-claim against Dellwood parallels Canajoharie's, and Schoharie has also moved for summary judgment thereon. Schoharie also contests Nedco's summary judgment motion.

POLAND

Poland is a dairy cooperative corporation also organized and existing pursuant to New York Cooperative Corporation Law (McKinney 1951, Supp.1987). Prior to May and June, 1985, Poland had been a member of Nedco; on April 1, 1985 Poland cancelled its membership, allegedly due to Nedco's breach of a Marketing Agreement entered into between the parties in July, 1977. However, in a complaint filed against Nedco in the New York Supreme Court, Oneida County, ("state action") Poland acknowledged that the Marketing Agreement was in effect in May and June, 1985. The July, 1977 Marketing Agreement provided at paragraph 1 that Nedco was to "purchase and acquire title to Poland's milk". In May and June, 1985, Nedco purchased a total of 2,280,319 pounds of milk from Poland which it in turn sold to Dellwood. In its answer to the Southern District interpleader action, Poland admits this milk was delivered and accepted by Nedco for delivery and sale to Dellwood and other purchasers. Poland claims the proceeds of its milk to be $332,131.47, while Nedco states the value to be $323,432.18.

In the state action, Poland at one point sought interlocutory relief in the form of direct payments from Dellwood, or in the alternative, placement of a lien on the proceeds. Yet, Poland has not made claim against other Nedco customers for Poland milk which Nedco purchased and delivered to those customers. Nedco determined which of its customers would receive Poland milk, and also directed its haulers to pick up Poland milk and deliver it to those

customers. Poland milk was thus intermingled with milk of other Nedco suppliers.

Poland seeks summary judgment on its cross-claim against Dellwood. Poland alleges it has a direct cause of action against Dellwood under the relevant milk regulations and statutes, and also that it has an "equitable lien" on the monies held by Dellwood.

## HERSHEY

Hershey is a corporation existing under the laws of the State of Delaware. Primarily known as a manufacturer of chocolate, it is active in the milk "spot market" for sale of its excess bulk milk. Somehow, at Nedco's request, Hershey and Nedco provided for Hershey's delivery of milk to Dellwood. As admitted by Hershey, this arrangement was to assist Nedco in meeting its contractual obligations to Dellwood.

Hershey alleges it shipped milk to Dellwood valued at $289,507.31; of this amount, Hershey states the sum of $37,433.91 represents the value of milk shipped and delivered on April 20 and 30, 1985. Nedco, not Dellwood, received an invoice from Hershey in the amount of $251,328.77.

Hershey commenced an independent action in the United States District Court for the Southern District of New York against Nedco and Dellwood in which it admitted 1) it sold milk to Nedco; 2) Nedco purchased the milk from Hershey; 3) the milk was delivered to Dellwood; and 4) Hershey invoiced Nedco, not Dellwood, for the milk.

Hershey seeks summary judgment against Dellwood on its cross-claim, the gist of which is that Dellwood has been unjustly enriched as a result of Hershey's milk deliveries.

## SUNNYDALE FARMS

Sunnydale is the only defendant which has not moved for summary judgment on its cross-claim against Dellwood, nor has it opposed Nedco's summary judgment motion via affidavits setting forth material fact.

Sunnydale is, like Hershey, a proprietary corporation which buys and sells milk. It is not a cooperative.

In order to fulfill its contract requirement with Dellwood, Nedco purchased milk from Sunnydale in May and June, 1985, as it had prior thereto. Sunnydale did not determine to which Nedco customer its milk would go, and the party has admitted that Dellwood is indebted to Nedco for the entire amount held.

The milk which Nedco purchased from Sunnydale, and in turn sold to Dellwood in May and June, 1985, totaled $90,914.79. Sunnydale billed Nedco for all milk sold.

Sunnydale's cross-claim against Dellwood seeks an amount of $110,967.57, and apparently requests payment for milk which Nedco did not sell to Dellwood in May and June, 1985.

## EASTERN

Eastern is a cooperative corporation whose members are dairy farmers engaged in the production of milk. Eastern sells the milk of its members, and over the past ten years has sold milk to Nedco; Nedco has likewise sold milk to Eastern. Eastern admits it delivered milk to Dellwood directly during May and June, 1985 pursuant to a contract between Nedco and Eastern. The deliveries had a total value of $442,369.48, and Eastern remains unpaid therefor. Eastern billed Nedco directly for this milk. Eastern did not determine the Nedco customers which were to receive the milk, for Nedco determined its own obligations to its customers, decided who would receive the Eastern milk, and directed the pick up and delivery of the milk. While those haulers of the Eastern milk were under contract with Eastern, Nedco controlled and determined the ultimate destination of the milk by either direct orders to Eastern, or delivery orders to the haulers.

Eastern's cross-claim alleges the Act, Order No. 2, and applicable New York State statutes give it a direct cause of action against Dellwood for the May and June, 1985 milk deliveries.

## MARKET ADMINISTRATOR

Pursuant to the Act, the Market Administrator is charged with the duty of administering Order No. 2. On June 21 and June 25, 1985, the Market Administrator de-

manded that Dellwood pay to the Market Administrator the difference between the "Uniform price" and the "Class I price" for the milk it purchased from Nedco in the months of May and June, 1985. The Market Administrator admits Dellwood purchased the milk from Nedco and is indebted to that party for the milk, but claims the sum of $364,671.45 from the money held by Dellwood for the "Producer-Settlement Fund". The Market Administrator argues Dellwood was "required to pay Nedco at 'class price' for milk received from Nedco".

The Market Administrator's cross-claim against Dellwood is two-fold: the Market Administrator seeks Dellwood's direct payment to the "Producer-Settlement Fund", and also asserts that Eastern is to recover the sum of $442,369.48 on behalf of producers of the milk represented by such funds.

## DELLWOOD

Dellwood is a New York corporation which is engaged in, among other things, the business of processing and selling of milk, and the selling of other milk products.

From March 1, 1982 until June 14, 1985, Dellwood purchased milk and milk products from Nedco, and in due course paid Nedco for the goods purchased. Dellwood has paid Nedco for all milk it purchased through April 30, 1985. As for the milk purchased during the months of May and June, 1985, the conflicting claims thereto have been set forth above.

Dellwood advances, as a counterclaim against Nedco, and a cross-claim against all defendants, a claim for interpleader relief. While Dellwood contends that only Nedco is entitled to all the sums currently held, it is ready and willing to pay for the May and June, 1985 milk to whichever party the Court directs.

As a second counterclaim against Nedco, and a second cross-claim against Eastern, Dellwood seeks declaratory relief for delivery and purchases of milk which took place in April, 1985. Dellwood paid Nedco for this milk, and thereafter, on or about June 14, 1985, Eastern laid claim to the proceeds of the sale.

As a third counterclaim against Nedco, Dellwood seeks contribution from Nedco should it be held liable to Eastern for the April, 1985 milk deliveries. Additionally, if Dellwood is held liable to Nedco for any of the May or June, 1985 milk purchases, Dellwood seeks set-off or recoupment in an amount equal to the amount for which it may be held obligated to Eastern for the April, 1985 purchases.

## APPLICABLE LAW

The Agricultural Marketing Agreement Act of 1937 was the result of Congressional intent to 1) establish and maintain orderly marketing conditions for agricultural commodities such as milk; 2) protect consumer interests; 3) provide for an orderly flow of commodities to market; and 4) establish parity prices paid to farmers. 7 U.S.C. § 602(1)–(5). The Act authorizes the Secretary of Agriculture to issue orders tending to effectuate the Congressional policy, 7 U.S.C. § 608c(1), (3) & (4), and provides for mandatory terms and conditions in milk orders. 7 U.S.C. § 608c(5). Pursuant to the Act, the Secretary issued Order No. 2, as well as an order setting forth general provisions of Federal marketing orders. 7 C.F.R. §§ 1001.1–1001.7. In general, Order No. 2 requires certain parties to account monthly for milk received and utilized, and to make minimum payments as prescribed therein. In order to appreciate the impact of the Act and Order No. 2, a review of the background problems within the dairy industry is appropriate.

Fluid milk, as compared to surplus milk, must be consumed quickly after production as it is "a fertile field for the growth of bacteria". *United States v. Rock Royal Co-op,* 307 U.S. 533, 549, 59 S.Ct. 993, 1002, 83 L.Ed. 1446 (1939). Surplus milk, or that milk which cannot be sold in fluid form, must be manufactured in more or less nonperishable products such as butter, cheese, or milk powder. Surplus milk commands a lower price in the market, for the resultant manufactured items are in competition with all similar dairy products, some produced in "low-cost production areas far removed

from the metropolitan centers." *Id.,* 307 U.S. at 550, 59 S.Ct. at 1002. Hence, while most producers of milk strive to sell in the fluid milk market—the most profitable arena for their product—unrestrained competition for this market would threaten both the quality and quantity of the fluid milk available for consumption. *Id.*

As the daily demand for milk fluctuates, and as cows produce more milk in the spring than they do in the fall, the fluid milk market is particularly unstable. These factors result in a "practicable adjustment of supply to demand", with the industry thus carrying a supply of surplus milk of about 20 per cent. *Nebbia v. State of New York,* 291 U.S. 502, 517, 54 S.Ct. 505, 507, 78 L.Ed. 940 (1934). The cutthroat competition and destructive price-cutting which threatened dairy farmers in the 1930's led to the realization that a "fair division among producers of the fluid milk market and utilization of the rest of the available supply in other dairy staples," was necessary. *United States v. Rock Royal Co-op., supra,* 307 U.S. at 550, 59 S.Ct. at 1002. Recognizing that a "satisfactory stabilization of prices of fluid milk requires the burden of the surplus milk market be shared equally by all producers and all distributors in the milkshed," *Nebbia v. New York, supra* 291 U.S. at 517–18, 54 S.Ct. at 507, the Act seeks to fairly apportion the more desirable fluid milk market between producers.

Milk is classified according to its form or intended use, and a minimum price is set for each class use, 7 U.S.C. § 608c(5)(A). The prices set are to be uniform among all "handlers", subject to adjustments not relevant herein. *Id.* While Order No. 2 provides for three milk classifications, 7 C.F.R. § 1002.41, it is more appropriate for present purposes to analyze a two-part classification scheme, for the pricing mechanism is essentially the same in either.

In a two-part classification program, milk utilization is classified into two fundamental groups: Class I (fluid milk) and Class II (milk products such as butter, cheese, etc.). Each month, following the provisions of Order No. 2, the Market Administrator determines the price for each class. From reports filed by all handlers, the total volume of milk used in each classification is ascertained. A total value of all milk is arrived at by multiplying the market volume figure for each class by the applicable class price. The class totals are then added, other irrelevant additions and subtractions are made thereto, and the sum is divided by the aggregate volume of all the milk to determine the "Uniform Blend price" which is to be paid to all milk producers, regardless of the specific utilization of their milk by a handler. As the value of each handler's use of milk received from producers would not average out to the Uniform Blend price, the Act creates a "Producer-Settlement Fund" ("Fund"). 7 U.S.C. § 608c(5)(C). Handlers whose total class utilization value of milk exceeds the value of the milk at the Uniform Blend price must make payments to the Fund. Payments out of the Fund are made to handlers whose total class utilization value of milk is less than the value of the milk at the Uniform Blend price. Hence, the producer always receives the Uniform Blend price for his milk, regardless of the handler's utilization of his milk. A handler, on the other hand, will either pay the Fund, or receive payments therefrom, depending upon the actual use value of the milk purchased. Handlers are designated as either "debit" or "credit", depending on whether money is to be paid or received from the Fund. The United States Supreme Court approved the above pooling process in *United States v. Rock Royal Co-op., supra,* for the procedure allows all producers to share equally the more lucrative fluid milk price.

Milk Order No. 2 defines a "handler" of milk at 7 C.F.R. § 1002.7:

(a) Any person who engages in the handling of skim milk or butterfat which was received at a pool plant, a partial pool plant, a pool unit or a partial pool unit or at a plant approved by any health authority as a source of skim milk or butterfat for disposition as fluid milk products in the marketing area.

(b) Any person who engages in the handling of fluid milk products, all or a

portion of which is shipped to, or received in, the marketing area; or

(c) Any cooperative association with respect to milk which it causes to be delivered from producers to any other handler for the account of such association and for which such association receives payment.

Additionally, the Act places limits on the manner in which handlers are to pay producers or cooperatives for milk the former purchase from the latter. 7 U.S.C. § 608c(5)(A) provides:

In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others:

(A) ... fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payment shall be made, for all milk purchased from producers or associations of producers.

Further, Order No. 2 provides:

§ 1002.50a Class Prices

For pool milk received during each month from dairy farmers or cooperative associations of producers, each handler shall pay per hundred weight not less than the prices set forth in this section.... Any handler who purchases or receives milk during any month from a cooperative association of producers but does not operate the plant or unit receiving this milk from producers shall pay the cooperative association on or before the 19th day of the following month for such milk at not less than the class prices pursuant to this section.... Such payments to a cooperative association shall be deemed not to have been made until the payments have been received by the cooperative association.

In addition to the Act and Order No. 2, the State of New York has adopted legislation which regulates the buying and selling of milk. Article 21 of the New York Agriculture and Markets Law, § 258–b (McKinney Supp.1987) provides:

2. Prompt payment for milk. (a) Every milk dealer shall: (1) on or before the tenth day of each month, pay for all milk received from producers ...

This section is designed to effectuate the public policy behind enactment of the state statutes:

It is declared to be the policy of the state to protect independent milk producers and cooperatives against loss of payment for milk because of defaults by *purchasers,* so that such milk producers will be able to continue the production of an adequate and wholesome supply of milk for the consuming public.

L.1975, c. 526, § 1. (emphasis added). Further, New York state has adopted State Marketing Order No. 126 (1 NYCRR, No. 20), the language of which is identical to Order No. 2.

As for applicable provisions of the Code, § 541 provides in relevant part:

(a) The commencement of a case under section 301 ... of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) ... all legal or equitable interests of the debtor in property as of the commencement of the case.

Code § 542 provides in relevant part:

(b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

## CONCLUSIONS OF LAW

### I. JURISDICTION

Eastern, in its amended answer and cross claim, has questioned the jurisdiction of the Court to entertain the present dispute, referring to the interpleader action pending before the Southern District court as a bar. Hershey similarly questions the Court's jurisdiction.

Due to the filing of Nedco's petition for relief under Chapter 11, all actions and proceedings against it were stayed automatically. Code § 362(a)(1). Judge Brieant, United States District Court Judge for the Southern District of New York, in rulings on December 30, 1985 in the Southern District interpleader action, clearly indicated his unwillingness to proceed further in those proceedings "without a waiver of the [Code § 362] stay, because any such proceeding might have a detrimental effect on the debtor ...". Judge Brieant then stayed all further proceedings in the Southern District interpleader action, save for initiation of Hershey's intervenor action, and Nedco's present action before this Court. Judge Brieant stayed further proceedings in Hershey's intervenor action, and directed Hershey to seek relief from the automatic stay before this Court should it choose to continue in the District Court for the Southern District of New York. Apparently, Eastern and Hershey believe these actions to be without weight, yet even if the District Court's actions are deemed unwarranted, well established case law confirms the Court's jurisdiction.

■ In its amended complaint in the Southern District interpleader action, Dellwood stated it owed Nedco for milk it purchased in May and June of 1985 pursuant to a contract with Nedco. "The subject matter of an interpleader action is defined by the fund deposited by the stakeholder." *Gaines v. Sunray Oil Co.*, 539 F.2d 1136, 1141 (8th Cir.1976); *Wertheimer v. Bank of Nova Scotia*, 140 F.Supp 950, 953 (S.D. N.Y.1956). Thus, as acknowledged in the interpleader action by all defendants thereto, as well as all present defendants, the proceeds of the Dellwood-Nedco milk contract are the res to which each lay claim.

Both the District Court for the Southern District of New York and this Court have jurisdiction to determine the priority of interests in the sums deposited by Dellwood.

In an analogous situation, the Sixth Circuit Court of Appeals held the Bankruptcy Court to be the appropriate forum for resolution of an interpleader action involving a debtor as a named defendant, wherein the res was allegedly property of the estate. *NLT Computer Services Corp. v. Capital Computer Systems, Inc.*, 755 F.2d 1253 (6th Cir.1985). *NLT Computer Services* involved the commencement of an interpleader action in United States District Court by a party which had purchased computer software and licenses from the debtor; the interpleader action was necessary as several creditors of the debtor claimed a prior right in the proceeds. Thereafter, an involuntary petition in bankruptcy was filed against the debtor, yet the district court resolved the interpleader on the merits prior to a motion to lift the Code § 362 stay being filed in the bankruptcy court, or the matter being formally withdrawn pursuant to 28 U.S.C. § 1452,[2] or the district's local rules procedure.

The Sixth Circuit Court of Appeals held that under the circumstances, the district court lacked the power to reach the merits of the interpleader action, for even with the broad power to withdraw the matter from the bankruptcy court, some appropriate action (i.e. a motion to lift stay) must first be taken in the bankruptcy case itself. *Id.* at 1258. Specifically noting Congressional intent that "a broad range of property [is] to be included in the [debtor's] estate,"[3] the Sixth Circuit Court of Appeals recognized:

The only purpose of the interpleader action was to determine the ownership of the funds, for the plaintiff therein made no claim to the money and did not dispute its legal obligation to pay. Therefore, the interpleader court's only function was the same as that which is vested in the bankruptcy court under the Bankruptcy Code, that is, to determine the relative priority of competing claims to the fund.

---

**2.** The hearing before the district court was held while the district operated under emergency rules adopted in the aftermath of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

**3.** *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 209, 103 S.Ct. 2309, 2316, 76 L.Ed.2d 515 (1983).

*Id.* at 1263. The Sixth Circuit Court of Appeals noted further that this function was to be performed by an Article III judge rather than a bankruptcy judge, yet tentatively observed that where "there are competing claims to the property of a bankrupt, it was Congress' probable intent to allow the adjudication of such competing claims and priorities under the Bankruptcy Act within the framework of the bankruptcy proceedings themselves to the extent that they constitutionally could be heard." *Id.* at 1263–64. Judge Brieant's actions evidence his deference to the Court's resolution of a dispute which under cloak of either an interpleader action, or Debtor's present adversary proceeding, is designed to benefit the bankruptcy estate, and thus Congressionally contemplated to be adjudicated during the course of these proceedings. *Id.* at 1264.

There is no question that the United States District Court for the Northern District of New York has original and exclusive jurisdiction over Nedco's Chapter 11 case pursuant to 28 U.S.C. § 1334(a). The Northern District Court has original, but not exclusive, jurisdiction of all civil proceedings arising in or related to this case, 28 U.S.C. § 1334(b), and has exclusive jurisdiction over all of Nedco's property wherever located as of the commencement of the case. 28 U.S.C. § 1334(d). Pursuant to 28 U.S.C. § 157(a), the District Court has referred to this Court all cases under Title 11, all proceedings arising under Title 11, and all proceedings arising in or related to a case under Title 11. *In re Procedure for the Handling of Cases Under and Proceedings Arising In or Related to a Case Under Title 11, U.S.C.,* Order (N.D.N.Y. July 20, 1984) (Munson, C.J.). Thus, the only jurisdictional question raised by Eastern and Hershey concerns the Court's authority to enter a final order under 28 U.S.C. § 157(b)(1), or merely to submit proposed findings of fact and conclusions of law to the Northern District Court for consideration. 28 U.S.C. § 157(c)(1).

The Court has initial responsibility for classifying a matter as either "core" or "non-core". 28 U.S.C. § 157(b)(3). 28 U.S.C. § 157(b)(2)(A)–(O) contains a non-ex-haustive list of core proceedings; subsections (A) and (O) therein are "catchall" categories for "matters concerning the administration of the estate," and "other proceedings affecting liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship." Nedco argues that as its action is one to compel turnover of property of the estate, 28 U.S.C. § 157(b)(2)(E), it is a core proceeding with the Court empowered to enter a final judgment and determination on the merits. As a basis for this position, Nedco relies upon an unpublished opinion of the United States Court of Appeals for the Fifth Circuit, *Holland America Ins. Co. v. Succession of Shepard J. Roy,* 777 F.2d 992 (5th Cir.1985), as well as two decisions by Bankruptcy Judge Buschman of the United States Bankruptcy Court for the Southern District of New York, *Fisher v. Insurance Co. of Pennsylvania (In re Pied Piper Casuals, Inc.),* 50 B.R. 549 (Bankr.S.D.N.Y.1985); *Lesser v. A–Z Asso. (In re Lion Capital Group),* 46 B.R. 850 (Bankr.S.D.N.Y.1985). Nedco also relies upon *Baldwin-United Corp. v. Thompson (In re Baldwin-United Corp.),* 48 B.R. 49 (Bankr.S.D.Ohio 1985), as authority for the Court's requested recognition that 28 U.S.C. § 157(b)(2)(E) is to be given broad interpretation as a "term of art in the bankruptcy context." *Id.,* at 53.

■ The Court has thoroughly reviewed the cases cited by Nedco, as well as the numerous decisions which have attempted to define the width of the bankruptcy court's turf in the wake of *Northern Pipeline, supra.* As recognized in *NLT Computer Services, supra,* 755 F.2d at 1263–64, it is clear that Congress intended the bankruptcy court to act as the primary authority over disputes such as that presented. Yet, the Court does not believe the mere characterization of proceedings as one for turnover is dispositive of whether the action is a core proceeding. In this regard, the Court believes a bankruptcy court is required to look behind the characterization, and analyze the true nature of the relief sought.

■ Thus, in *Satelco v. North American Publishers (In re Satelco)*, 58 B.R. 781, 789 (Bankr.N.D.Tex.1986), the bankruptcy court determined it lacked jurisdiction to enter a final order in an alleged turnover proceeding to collect accounts receivable, absent a final judgment from another court of competent jurisdiction, a stipulation, or some other binding determination of liability. The court rejected the approach adopted in *Baldwin-United Corp. v. Thompson (In re Baldwin-United Corp.)*, *supra*, holding it to be "fundamentally flawed", for it turns

> mere allegation into fact; by asserting that the money attributable to an account receivable is property of the estate, a debtor could, under the foregoing authorities, establish the constructive possession necessary for the bankruptcy court to exercise jurisdiction. Unless there is no question remaining as to the liability of the defendant to the estate ... it cannot be said that no dispute exists, and the money Debtor seeks to recover is not within the Debtor's constructive possession.

*Satelco v. North American Publishers, supra*, 58 B.R. at 786. In the present case, Nedco's claim to the monies due from Dellwood is contested by all the defendants, save Dellwood and Sunnydale. The Court does not believe the present action can be resolved by simple execution of a turnover order, for based upon the foregoing, Nedco's action is not a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E).

■ Consequently, the Court rejects those decisions holding collection of an account receivable to constitute a core proceeding. *See, e.g., Baldwin-United Corp. v. Thompson (In re Baldwin-United Corp.)*, *supra; Franklin Computer Corp. v. Harry Strauss & Sons, Inc. (In re Franklin Computer, Corp.)*, 50 B.R. 620 (Bankr.E.D.Pa.1985); *Harry C. Partridge, Jr. & Sons, Inc. v. M & R Construction Corp. (In re Harry C. Partridge, Jr. & Sons, Inc.)*, 48 B.R. 1006 (Bankr.S.D.N.Y. 1985). To the extent Nedco's claim herein rests upon a claim in contract, such is similarly held not to constitute a core proceeding. *Contra, Fisher v. Insurance Co.*

*of Pennsylvania, supra; Lesser v. A–Z Asso., supra*. The Court believes its holding aligns with the narrow construction of 28 U.S.C. § 157(b)(2) in light of the *Marathon* decision. *Accord, Mohawk Indus., Inc. v. Robinson Indus., Inc.*, 46 B.R. 464 (D.Mass.1985); *Pierce v. Airport Development Corp. (In re Pierce)*, 44 B.R. 601 (D.Colo.1984); *Taxel v. Commercebank (In re World Financial Services Center, Inc.)*, 64 B.R. 980, 986 (Bankr.S.D.Cal.1986); *In re Century Brass Products, Inc.*, 58 B.R. 838 (Bankr.D.Conn.1986); *Arnold Print Works, Inc. v. Apkin (In re Arnold Printworks, Inc.)*, 54 B.R. 562 (Bankr.D.Mass. 1985); *Cameron v. Anderson (In re American Energy, Inc.)*, 50 B.R. 175 (Bankr.D. N.D.1985); *Cristol v. Western Book Distrib. (In re Schear & Asso., Inc.)*, 47 B.R. 544 (Bankr.S.D.Fla.1985); *Smith-Douglass, Inc. v. Smith (In re Smith-Douglass, Inc.)*, 43 B.R. 616 (Bankr.E.D.N.C.1984); *Atlas Automation v. Jensen, Inc. (In re Atlas Automation, Inc.)*, 42 B.R. 246 (Bankr.E. D.Mi.1984).

■ While the Court determines it lacks authority to enter a final order as to Nedco's complaint as a core proceeding, the Court does possess the subject matter jurisdiction necessary to hear the proceeding as a "related matter" under 28 U.S.C. § 157(c)(1), and thereafter submit a proposed Order to the District Court for the Northern District of New York. The Court has been hard pressed to find a better definition of a "related proceeding" than "whether the outcome of the proceeding could conceivably have *any effect upon the estate* being administered in bankruptcy." *Mazur v. U.S. Air Duct Corp. (In re U.S. Air Duct Corp.)*, 8 B.R. 848, 851 (Bankr.N. D.N.Y.1981) (emphasis in original); *See also, Crown Central Petroleum Corp. v. Wechter (In re General Oil Distributors, Inc.)*, 21 B.R. 888, 892 n. 13 (Bankr.E.D.N. Y.1982); 1 King, COLLIER ON BANKRUPTCY, ¶ 3.01, p. 3–49 (15th ed. 1986). Should Nedco recover the monies deposited by Dellwood in the interpleader action, a greater distribution to creditors herein will necessarily follow. As the outcome of Nedco's action and the various counter-

claims and cross-claims herein will affect the bankruptcy estate, the Court has jurisdiction pursuant to 28 U.S.C. § 157(c)(1).

## II. MOTIONS OF CANAJOHARIE, SCHOHARIE

Canajoharie and Schoharie claim they are entitled to a portion of the interpleader funds as they "consigned" to Nedco the milk which it in turn sold to Dellwood. However, a review of the Marketing Agreements in effect between these parties and Nedco, as well as the undisputed facts of these parties' relationship, reveals an intention to create a totally different legal relationship. Additionally, relevant case law dictates that as a matter of law, the summary judgment motions of these parties on their cross-claims against Dellwood must be denied, and conversely, those of Nedco and Dellwood granted.

Neither Canajoharie or Schoharie dispute the following facts: 1) their Marketing Agreements with Nedco were in effect in June of 1985; 2) their milk was delivered to Nedco; and 3) they billed Nedco and not Dellwood for the milk which they sold pursuant to their respective Marketing Agreements. Each Marketing Agreement provides that "Nedco shall purchase and acquire title" to the milk sold by Canajoharie and Schoharie. Nedco collected the milk from these cooperatives, blended it with milk from other member producers, determined the customers (e.g. Dellwood) which would purchase the milk, received the proceeds of sale, and after making certain deductions, disbursed the appropriate sums to its member producers, Canajoharie and Schoharie among them. As such, these parties are in no way different than any of Nedco's other member producer creditors which have not been paid for milk. The undisputed facts reveal no privity of contract between these parties and Dellwood, and clearly, neither party previously made claim against Dellwood for milk which Dellwood purchased from Nedco, and which Nedco had received from these two defendants.

▪ Where a dairy producer cooperative entered into an agreement to "consign" the milk of its members to a dairy processing cooperative, and thereafter delivered milk to a third party as a part of the agreement, the dairy producer cooperative could not collect from the third party for milk delivered to it, for which it remained unpaid due to the bankruptcy of the dairy processing cooperative. *Baltimore Bank for Cooperatives v. Farmers Cheese Cooperative*, 612 F.2d 151 (3d Cir.1979). In *Baltimore Bank, supra,* the dairy producer cooperative demanded payment from the third party for milk it had delivered to that party pursuant to its contract with the bankrupt dairy processing cooperative. The third party paid the dairy producer cooperative the balance listed on its books due the bankrupt dairy processing cooperative. An assignee of the accounts receivable of the bankrupt dairy processing cooperative commenced suit to recover the sums paid out.

▪ The Third Circuit Court of Appeals reversed the District Court, which had allowed the jury to determine whether the transaction between the dairy producer cooperative and the bankrupt dairy processing cooperative was a sale or true consignment, in which the latter was merely an agent of the former. The Court of Appeals held that even where an agreement spoke of consignment, the dairy producer cooperative was not entitled to payment from the third party. *Id.* at 154. In so concluding, the court relied primarily upon the decision of *Knuth v. Erie-Crawford Dairy Co-op. Asso.*, 463 F.2d 470, (3d Cir.1972) *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973). After describing the obligations of a cooperative to its member producers under a consignment agreement identical to that under consideration in *Baltimore Bank, supra,* the *Knuth* court had stated:

> While the producers may have retained title to the consigned milk until sale, it is quite clear that the members do not have title to the proceeds of sale. Each has only a contract right to be paid by the cooperative a sum of money calculated in accordance with his agreement. At best each has a right to an accounting from his debtor-agent.

*Baltimore Bank for Cooperatives v. Farmers Cheese Cooperatives, supra,* 612 F.2d at 154, *quoting Knuth v. Erie-Crawford Dairy Co-op. Asso., supra,* 463 F.2d at 478. Similar expressions of the true legal relationship between cooperative and producers may be found in *Maryland & Virginia Milk Producers' Ass'n., Inc. v. District of Columbia,* 119 F.2d 787 (D.C. Cir.) *cert. denied,* 314 U.S. 646, 62 S.Ct. 87, 86 L.Ed. 497 (1941). In this case, a cooperative sought to avoid personal property tax liabilities on the grounds it was merely a collecting agent for the producers with which it had contracts detailing the "consignment" of milk from the latter to the former. The Court of Appeals for the District of Columbia noted:

> Even when a cooperative association's contracts with its milk-producing members have been phrased clearly in terms of agency, it has been conceded that title to the milk passed to the association, and held that the association, and not the member, was the actual seller of the milk which the distributors bought. We think the petitioner [cooperative] acted as a principal and owned the accounts receivable.

*Id.,* at 792.

In expressing this sentiment, the Court of Appeals for the District of Columbia specifically relied upon the New York decision of *People v. Shoemaker,* 228 A.D. 314, 239 N.Y.S. 71, *aff'd.* 254 N.Y. 567, 173 N.E. 869 (1930). In *Shoemaker, supra,* the State of New York attempted to hold an individual responsible for operating a milk gathering station and purchasing milk from producers while unlicensed. The individual had purchased milk from a dairy cooperative, and the state argued the cooperative was merely the "agent" of its producer members, pointing out that the contract between these parties was phrased in terms of agency. This argument was rejected, with the Appellate Division of the New York Supreme Court noting that title to the milk had passed from the producers to the cooperative. *Id.,* at 318, 239 N.Y.S. 71. "Under such a practice ... no particular producer could say that he had any claim against the buyer for any particular

sum of money for any particular milk or cream sold by the [cooperative]." *Id.*

In affirming the decision of the Appellate Division in *Shoemaker, supra,* the New York Court of Appeals ruled without opinion, citing the decision of *Wilson v. Isreal,* 227 N.Y. 423, 125 N.E. 819 (1920). In *Wilson, supra,* the Court of Appeals for the first time recognized that irrespective of the language utilized in a contract between a cooperative and a producer, the cooperative:

> took complete title to the milk and cream which was brought to it, had absolute control and ownership of it, and sold to whomsoever its officials desired and collected the pay therefor. ... [I]t had acquired as against all real producers complete title and control over the product which they had sold and transferred to it. The course of dealing between the association and those who owned the cows and drew the milk, whatever the ultimate purpose, completely detached the title to, ownership and control of the milk from the producer and transferred them to a marketing corporation ...

*Id.* at 428, 125 N.E. 819.

The above cases are dispositive of the Canajoharie and Schoharie claims. Even if their contracts with Nedco were framed in terms of agency or consignment, Nedco remains the proper party due the payment for the May and June, 1985 milk sold to Dellwood. As a matter of law, Nedco is entitled to summary judgment on its causes of action against both Canajoharie and Schoharie. Likewise, Dellwood is granted summary judgment on its cross-claim against Canajoharie and Schoharie, and the summary judgment motions on their cross-claims against Dellwood are denied.

## III. MOTION OF HERSHEY

■ Hershey seeks summary judgment on its cross-claim against Dellwood. Hershey alleges that Dellwood has been "unjustly enriched" because it accepted milk and milk products from Hershey, who sold

and delivered the same at the request of Nedco.

Hershey has conceded that it sold the milk to Nedco. It is clear that Hershey considered Nedco to be the buyer of the milk, for it billed the debtor, rather than Dellwood.

Hershey recognizes that a claim of unjust enrichment arises in circumstances where an implied contract is "adapted to enforce legal duties where *no formal contract exists.*" (Emphasis added). Hershey then ignores the fact that unjust enrichment is an equitable theory utilized to extract payment for value from one who retains benefits while having no contractual obligation to pay for those benefits. The party retaining the benefit "must have failed or refused with knowledge of the facts to perform the obligation." 12 *Williston on Contracts*, § 1479, p. 276–77 (3d ed.).

Dellwood was legally obligated to pay Nedco for the milk it purchased, just as Nedco was likewise legally obligated to Hershey. Dellwood has never refused or denied its obligation to pay for the May and June, 1985 milk it purchased, but has merely taken the position that the funds will be held until claims against it are resolved. Dellwood and Nedco had a legally binding agreement between them which obligated Dellwood to pay Nedco for milk delivered. Hershey's puerile arguments are immaterial and fatally flawed in light of this fact.

The Courts of the State of New York have long recognized that:

> A contract cannot be implied *in fact* where the facts are inconsistent with its existence; or against the declaration of the party to be charged; or where there is an express contract covering the subject matter involved; or against the intention or understanding of the parties; or where an express promise would be contrary to law. The assent of the person to be charged is necessary and unless he has conducted himself in such a manner that his assent may be fairly inferred he has not contracted.

*Miller v. Schloss*, 218 N.Y. 400, 406–07, 113 N.E. 337 (1916) (emphasis in original).

Thus, in refusing to hold a property owner directly responsible to a subcontractor in the absence of a mechanics lien, the Appellate Division of the New York Supreme Court noted:

> Where there is an express contract, as here, between the general contractor and the subcontractor, the owner of the subject premises may not be held directly liable to the subcontractor on a theory of implied or quasi-contract, unless he has in fact assented to such an obligation; the mere fact that he has consented to the improvements provided by the subcontractor and accepted their benefit does not render him liable to the subcontractor, whose sole remedy lies against the general contractor. (citations omitted).

*Contelmo's Sand & Gravel, Inc. v. J & J Milano, Inc.*, 96 A.D.2d 1090, 1091, 467 N.Y.S.2d 55 (1983). In the absence of privity of contract between the party furnishing work and material which benefits a third party, the former may not recover from the latter when the former has a contract with another party. *Pellegrino v. Almasian*, 10 A.D.2d 507, 509, 201 N.Y.S.2d 275 (1960).

Hershey relies upon a series of federal level cases involving defaults under Housing and Urban Development projects. In *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28 (2d Cir.1979), an unpaid general contractor brought suit against HUD for contractual damages when the latter had taken over unfinished construction projects upon the original owner's default. HUD denied a duty to pay the general contractor. The Second Circuit Court of Appeals recognized HUD's potential obligation to the general contractor under a theory of unjust enrichment, and noted possible relief in the form of an equitable lien. *Id.*, at 37. However, unlike HUD, Dellwood does not allege that Nedco is not entitled to the withheld sums, or that it may retain the benefits of the May and June, 1985 milk without payment thereon. Nor has Dellwood alleged that Nedco breached the contract between the parties, thus relieving the former of its payment obligation. Similarly, unlike the position

taken by HUD in *Spring Construction Co., Inc. v. Harris,* 562 F.2d 933 (4th Cir. 1977), with reference to the unpaid general contractor and the owners of the housing project, Dellwood has recognized its obligation to Nedco, and stands willing to see it satisfied.

In *Taylor Woodrow Blitman Construction Co. v. Southfield Gardens Co.,* 534 F.Supp. 340 (D.Mass.1982), the court denied the contractor's claim of quasi-contract because it had an adequate remedy at law. The District Court recognized that where a third party benefits from a contract between two others, "and one of the contracting parties defaults, the other party does not automatically have an unjust enrichment claim against the third party.... More than a benefit to the third party is necessary." *Id.,* at 347. Citing *S.S. Silberblatt, Inc., supra,* the District Court recognized that a plaintiff wishing to succeed on an unjust enrichment claim "must show that the defendant has at the plaintiff's expense been enriched *and unjustly so,* such as when the defendant receives requested goods or services without paying any compensation therefor. *See* Palm, I *Law of Restitution,* § 1.7 at 42 (1978); *Restatement of Restitution,* § 1 (1937) (emphasis added)." *Taylor Woodrow Blitman Construction Co., supra,* 534 F.Supp. at 347 *quoting S.S. Silberblatt, Inc., supra,* 608 F.2d at 37.

■ The fact that Nedco has sought relief under Chapter 11 does not destroy the adequacy of Hershey's remedy at law, "since the ability to bring an action at law and recover judgment determines the adequacy of the legal remedy, irrespective of the ability to collect on the judgment. The adequacy of the legal remedy for damages does not depend upon the collectibility of the claim." 20 N.Y.Jur., *Equity,* § 25, 40 (1976). In determining whether an adequate remedy at law exists, the crucial inquiry is whether the complaining party can obtain a judgment of money damages, not whether any resultant judgment is collectible because of the solvency of the party against whom it is entered. .

Finally, the holding of *Paschall's, Inc. v. J.P. Dozier,* 219 Tenn. 45, 407 S.W.2d 150 (1966) is inappropriately applied to the facts herein. In ruling that the owners of a house were obligated to a contractor who had performed work on the house pursuant to a contract with relatives of the owners, the court acknowledged that it is unjust for a party to retain benefits without paying the value thereof. The court went on to note that if the owners had in some way given consideration for the improvements, then the equities would not lie in favor of holding them responsible for the improvements. In the present case, Dellwood has promised to pay, and desires to pay, Nedco for the milk. The consideration found lacking in *Paschall's, supra,* is readily apparent herein.

■ As for Hershey's claim of an equitable lien upon the proceeds, this theory of recovery also has its "ultimate foundation in contract express or implied." *James v. Alderton Dock Yards Ltd.,* 256 N.Y. 298, 303, 176 N.E. 401 (1931). Having failed to establish that it is entitled to recover upon a theory of unjust enrichment or quasi-contract, Hershey is unable to recover upon a claim of equitable lien. *Macina v. Macina,* 94 A.D.2d 791, 463 N.Y.S.2d 43 (2 Dept.1983), *aff'd.* 60 N.Y.S.2d 691, 468 N.Y.S.2d 463, 455 N.E.2d 1258 (1984). Summary judgment in favor of Nedco is therefore appropriate. Hershey is denied summary judgment on its cross-claim against Dellwood. Dellwood is granted summary judgment on its cross-claim against Hershey.

## IV. MOTION OF POLAND

■ Unlike the other parties herein, Poland alleges that unresolved, material questions of fact make summary judgment on Nedco's claim against it improper as a matter of law. The specific reference is to the issue of whether or not the marketing agreement between Poland and Nedco was cancelled. Poland seeks a declaration, as it had in the state court action, that it should have an equitable lien upon a portion of the funds held by Dellwood. This equitable relief would follow as a result of a determi-

nation that the market agreement between Nedco and Poland was rescinded due to Nedco's breach.

Yet, there can be no relief in equity when a party has an adequate remedy at law available to them. *Boyle v. Kelley*, 42 N.Y.2d 88, 91, 396 N.Y.S.2d 834, 365 N.E.2d 866 (1977). With reference to an attempted rescission of a contract for sale, and recovery of consideration or the proceeds of property, the New York Court of Appeals held:

> If, however, nothing executory remains, an action to declare a rescission, even though fraud is proved, does not lie as of course. "It is not in every case of fraud that relief is to be administered in a court of equity, and it is a well settled rule that wherever a matter respects only a sale of personal chattels, and lies merely in damages, the remedy is at law only. If this had been a sale of a horse to the plaintiff procured by fraud, it would not have been proper for her to resort to an equitable action for relief, because an action at law would furnish her an ample remedy, and give her all the relief to which she could, under any circumstances, be entitled." (*Bosley v. Nat. Machine Co.* [123 N.Y. 550, 25 N.E. 990]; *Buzard v. Houston*, 119 U.S. 347, 352 [7 S.Ct. 249, 252, 30 L.Ed. 451]). In the case at hand, the transactions have been fully executed. The plaintiffs are simply seeking to get back a sum of money paid under a contract, not affecting real estate, which they have elected to declare a nullity. To render the relief effective, it is not required that a court of equity should anathematize the closed transactions. The cause of action is at law, and the legal remedy is adequate.

*Schank v. Schuchman*, 212 N.Y. 352, 357, 106 N.E. 127 (1914).

As previously referenced, Poland's inability to collect a money judgment against Nedco does not render the legal remedy inadequate. 20 N.Y.Jr., *Equity*, § 25, 40 (1976). Poland has not alleged material facts which in any way alter the application of the above legal and equitable principles, and consequently, its motion for summary judgment on its cross-claim against Dellwood is denied. Nedco is entitled to summary judgment against Poland as a matter of law, and similarly, Dellwood is entitled to summary judgment on its cross-claim against Poland.

## V. MOTION OF EASTERN

 Eastern contends it has a direct right to receive payment from Dellwood due to the cited statutes and regulations controlling the sale of milk in the United States and in New York state in particular. Eastern relies upon that provision of Order No. 2 which provides:

> Any handler who purchases or receives milk during any month from a cooperative association of producers but does not operate the plant or unit receiving this milk from producers shall pay the cooperative association on or before the 19th day of the following month for such milk at not less than the class price ...

7 CFR § 1002.50(a).

Eastern reads Dellwood in place of "handler", and views itself in the position of the "cooperative association." This position is untenable, as the phrase "but does not operate the plant or unit receiving this milk from producers" refers to the word "handler", not the term "cooperative association of producers." Dellwood received all the Eastern milk at plants it operated in Fraser, Yonkers, Copiague, New York, New York, and at Farmland, New Jersey. Dellwood was a "handler" as defined in Order No. 2. 7 CFR § 1002.7. For that matter, both Nedco and Eastern are "handlers" under the regulation. Since Dellwood was a handler which did operate the plants receiving the milk, the term "handler" as used in 7 CFR 1002.50(a) cannot refer to Dellwood, whether or not it actually received or purchased the Eastern milk.

Eastern additionally relies upon 7 CFR § 1002.80:

> (a) On or before the 25th day of each month each handler shall make payment ... to each producer for all pool milk delivered by such producer during the preceding month at not less than the uniform price ...

Read literally, each handler would be liable to each unpaid producer whether or not the handler purchased milk from that producer, and whether or not the producer's milk was ultimately delivered to the handler. Eastern reads this section by substituting Dellwood for "handler", and itself for "producer", since it *delivered* the milk to Dellwood. Further, Eastern relies upon N.Y.Agric. & Mkts.Law § 258–b which provides:

 2. Prompt payment for milk.

 (a) Every milk dealer shall:

 (1) on or before the tenth day of each month, pay for all milk received from producers during the first fifteen days of the preceding month ... and every such milk dealer shall, on or before the 25th day of each month, pay the balance owed producers for milk received during the preceding month;

Eastern takes the position that Dellwood ("milk dealer") is liable to Eastern ("producer") under this statute, because the former "received" the latter's milk. For the reasons set forth below, Nedco is entitled to summary judgment against Eastern as a matter of law, and Eastern is denied summary judgment on its cross-claim against Dellwood, and its cause of action dismissed. Similarly, Dellwood is entitled to summary judgment as a matter of law on its two cross-claims against Eastern.

Eastern sold milk to Nedco. Nedco determined which of its customers would receive the milk. The fact that Nedco itself did not take physical receipt of the milk does not alter the fact that the contract in issue was between Nedco and Eastern, and not Dellwood and Eastern. In New York State, it has been recognized that delivery to and receipt by the buyer pursuant to a sales contract does not necessarily mean that the buyer will take physical possession of the property. It has been held that there was a "delivery" of property to a purchaser even though the property remained on the seller's premises, and the purchaser never took actual physical possession. *Integrity Ins. Co. v. Marine Midland Bank-Western,* 90 Misc.2d 868, 870–71, 396 N.Y.S.2d 319 (Sup.Ct.1977).

Delivery consists of the act by which goods are placed within the actual or constructive possession of another. A constructive delivery takes place when the conduct of the parties is such to be inconsistent with any other supposition than that there has been a change in the nature of the holding. The act or state of possessing is a condition of facts under which one can exercise power over property at its pleasure to the exclusion of all other persons and a constructive possession is assumed to exist where one claims to hold by virtue of some title without its actual detention or custody. Delivery and possession are not synonymous and "if there is a sale and the buyer has obtained title to the goods, his status as a buyer in ordinary course will not be defeated merely because he has not taken possession." (citations omitted).

While *Integrity Ins. Co., supra,* involved an issue arising under the New York Uniform Commercial Code, it proves equally instructive in the present case. Eastern's interpretation of 7 CFR § 1002.50(a) ignores the fact that the section applies most directly to the relationship between Nedco (as handler) and Eastern. The reading of the regulation and statute urged by Eastern would result in a total disregard for the concept of privity of contract, and ignore traditional notions of the obligations which arise pursuant to contract.

 The Secretary of Agriculture may not exceed the power delegated by the Agricultural Marketing Agreement Act of 1937 when promulgating regulations thereunder. *Smyser v. Block,* 760 F.2d 514, 520 (3d Cir.1985). The Act is to be construed narrowly. *Zuber v. Allen,* 396 U.S. 168, 183–87, 90 S.Ct. 314, 322–25, 24 L.Ed.2d 345 (1969); *See also, Fairmont Foods Co. v. Hardin,* 442 F.2d 762, 766 (D.C.Cir.1971).

Section 608c of the Act sets forth the terms and conditions which may be included in the orders promulgated by the Secretary of Agriculture:

 (5) In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the follow-

ing terms and conditions, and (as provided in subsection (7) of this section) *no others:*

(A) ... providing a method for fixing, minimum prices for each such use classification which all *handlers* shall pay, and the time when payment shall be made, for *milk purchased from producers or associations of producers.* (emphasis added).

The import of the section is clear: Congress sought to control the relationship between seller and purchaser, and not between a seller and a third party which receives the delivery of the milk pursuant to a contract between seller and the purchaser. The Act recognizes that privity of contract is a necessary element prior to application of milk order provisions, and the Court is unaware of any decision which has interpreted the Act as abrogating common law principles which hold the seller is to seek recompense from the buyer, and not from a third party which received delivery of the product.

■ In the present case, Dellwood, Eastern and Nedco are all handlers. Yet it was Nedco, and not Dellwood, which was the cooperative handler whose payments to another cooperative (Eastern) were regulated by Order No. 2. The definition of "handler" as incorporated in Order No. 2 clarifies that actual physical receipt of milk is not the action which triggers responsibility for payment. As set forth in Order No. 2, "handler" means:

. . . . .

(c) any cooperative association with respect to milk which it causes to be delivered from producers to any other handler for the account of such association and for which such association receives payment.

7 CFR § 1002.7.

The Court believes that 7 CFR § 1002.-80(a) must be read to provide that Nedco was the handler which was obligated to pay Eastern for the milk delivered by Eastern, whether the milk was delivered to Nedco or to some other entity such as Dellwood at Nedco's request. The Act and Order No. 2 cannot be said to permit recovery in the absence of privity of contract, or the absence of a direct producer-handler or handler-handler relationship.

Additionally, § 258–b(2) of the New York Agriculture and Markets Law does not support Eastern's claim, and its reliance upon the New York Legislature's policy declaration as set forth in L.1975, C.256, § 1, is misplaced. The policy behind the New York law is "to protect independent milk producers and cooperatives against loss of payment for milk because of defaults by *purchasers* ..." (emphasis added). This policy is then carried forth in § 258–b(2) which refers to payment of "the balance owed producers", and grounds the obligation to pay for milk not upon mere physical receipt, but whether the milk dealer in fact *owes* for the milk.

■ Eastern contends Dellwood is directly liable to it because § 258–b provides that every milk dealer (read Dellwood) shall "pay for milk *received* from producers." Prior to 1981, the statute had provided that "all milk dealers shall pay for milk purchased or received from producers ...". Eastern argues that the 1981 amendment evidenced a legislative intent to broaden responsibility for payment. This argument was previously advanced by Eastern in a different venue, and rejected by the New York Court of Appeals. In *Eastern Milk Producers Cooperative Asso., Inc. v. State of New York Dept. of Agriculture and Markets*, 58 N.Y.2d 1097, 1101, 462 N.Y. S.2d 814, 449 N.E.2d 708 (1983) the New York Court of Appeals noted:

Amendment of a statute, without more, does not require a change in its judicial construction. In view of the fact that the statute in its original form can be so read, the amendment must be regarded as but a legislative amplification of its previous intent.

The Court believes that absent more compelling proof other than a change in wording, the 1981 amendment is to be regarded as an "amplification" of the legislature's previously stated intent that *purchasers* are to bear the burden to make payment to producers. Certainly, had the

legislature intended to eradicate traditional notions of privity of contract, and expand liability for payment to a party such as Dellwood, something more than an alteration of language would be required to read the statute as now urged by Eastern. The Court's determination comports with the New York Court of Appeals that "[i]n the absence of a manifestation of intent to change a long-established practice, ordinarily no design to do so will be attributed to legislative action." *McGowan v. Mayor*, 53 N.Y.2d 86, 194, 440 N.Y.S.2d 595, 423 N.E.2d 18 (1981).

To a certain extent, the general pronouncements of the New York Court of Appeals in *Zappone v. Home Insurance Co.*, 55 N.Y.2d 131, 447 N.Y.S.2d 911, 432 N.E.2d 783 (1982) are applicable. In *Zappone, supra,* the plaintiffs sought to hold the defendant insurance company liable for a risk not covered by its insurance policy because the insurer had not denied coverage as required under New York Insurance law. The Court of Appeals reiterated the general rule of statutory construction that liberal interpretation is not to be granted "when to do so will occasion great inconvenience, or produce inequality, injustice or absurdity." *Id.,* at 137, 447 N.Y.S.2d 911, 432 N.E.2d 783.

> It is, moreover, always presumed that no unjust or unreasonable result was intended and the statute must be construed consonant with that presumption ..., the court looking to the purpose of the legislation as a whole rather than its literal words.

*Id.* (citations omitted).

The Court of Appeals consequently refused to interpret New York Insurance Law to provide for "an added source of indemnification which had never been contracted for." *Id.* In the present case, Eastern cannot "bootstrap" an obligation due it from Dellwood by selectively interpreting New York law in contravention of its express contract with Nedco. As a result, Nedco is granted summary judgment against Eastern. Similarly, Eastern is denied summary judgment on its cross-claim against Dellwood.

## VI. MOTION OF MARKET ADMINISTRATOR

The Market Administrator argues, in essence, that Nedco did nothing more than act as a conduit for sums the Debtor received which were to be paid into the Fund. The Market Administrator seeks to satisfy Nedco's obligation to the Fund by collecting the monies of an account receivable due the Debtor from its creditor, Dellwood.

As indicated above, Order No. 2 requires a handler in direct relationship with a producer to pay the producer "at not less than the uniform price." 7 CFR § 1002.80(a). As referenced, the uniform price (or blend price) is determined by means of a market-wide pooling and blending of all classes of milk, based upon use, and constitutes the weighted average of all pool milk used in all classes by all handlers regulated under Order No. 2. In a two-class system, the uniform price is less than the Class I price, but greater than the Class II price.

Producers will in all circumstances receive a blend price from a handler, yet the handler is obligated to pay a minimum class price depending upon its use of the milk. Thus, if a handler purchases milk for Class I use, the handler will pay the producer the uniform price, and will pay the Fund the difference between the Class I price and the uniform price.

While the Market Administrator argues that Nedco is merely a conduit or "trustee" for sums due the Fund, the Court's research reveals no support for this novel theory. In fact, it has only been held that the handler acts as a conduit for the flow of sums *from* the Fund to producers. In *In re United Milk Products Co.*, 261 F.Supp. 766 (N.D.Ill.1966), the bankrupt handler had received a payment *from* the Fund for the difference between the uniform price it had paid its producers and the lower use price. The issue was whether the funds so received became part of the Debtor's estate; if so, the producers would have been required to file claims as general unsecured creditors. The district court affirmed the decision of the bankruptcy ref-

eree that the handler was a mere "conduit", with an obligation to remit the sums to the producers. The district court noted that the subject funds would never "reach" the bankrupt-handler "except in those instances where because of a low 'use price' it had not paid the producers the 'uniform' price due." *Id.,* at 768.

Thus, the debtor has no independent right to the sums but is merely serving the function of a delivery agent, transferring money from the bottling handlers, through the Producer Settlement Fund, to the raw milk producers who are entitled to a uniform price whatever ultimate use is made of their product.

*Id.*

While Nedco, in those situations where it acted as a "credit" handler to pass along sums from the Fund to its producers, served as nothing more than a "disbursing agent," it did not so act when it received monies from entities like Dellwood for milk which it sold on behalf of its member producers. The Market Administrator's "inverse trust" theory is inapplicable, as Nedco was not to pass such monies on intact to the Fund; rather, Nedco, where it was a "debit" handler pooled the money received on its accounts receivables, made appropriate deductions therefrom, and forwarded on an amount which was less than the class price. Such arrangements for deductions by a handler with respect to milk of its member producers sold by the handler are specifically authorized by Order No. 2. 7 CFR § 1002.80(c).[4]

The Market Administrator also relies upon an unreported decision of the bankruptcy court for the district of New Jersey in support of its conduit or "trust" theory. *Michaels v. Cassidy (Matter of G.S.F. Corp.),* No. B–77–03101 (Oct. 14, 1980, Bankr.D.N.J.) (DeVito, B.J.). In *G.S.F., supra,* the debtor-handler sought to set off

sums in possession of the Market Administrator against monies it owed the Fund as a result of prior transactions. The funds held by the Market Administrator represented the difference between the uniform price and the lower class price, while the claim to be set off was the same as that for which the Market Administrator now seeks payment. The bankruptcy court held, relying upon *United Milk Products Co., supra,* that the monies held by the Market Administrator were not property of the estate. But more importantly for purposes of the present dispute, the bankruptcy court held the bulk of the Market Administrator's claim would be allowed as nothing more than a general unsecured claim against the Debtor's estate.[5]

The Court sees no reason why the holding reached by the *G.S.F.* bankruptcy court should be any less applicable in the present case merely because Dellwood holds a "pot of cash" from which the Market Administrator seeks payment. Consequently, the motion of the Market Administrator for summary judgment is denied. Nedco's motion for summary judgment is granted, as is Dellwood's motion for summary judgment on its cross-claim against the Market Administrator.

## VII. DELLWOOD MOTION FOR DISCHARGE FROM FURTHER LIABILITY

Dellwood maintains it is a disinterested stakeholder with respect to the balance owed for the May and June milk deliveries from Nedco. It acknowledges its obligation to pay for the milk, yet it is rightly concerned with the prospect of paying twice for the same milk. Consequently, Dellwood opposes the motions of Nedco and Eastern for summary judgment, and has cross-moved for an order discharging it from future liability upon its deposit of the

---

**4.** For example, reference is made to paragraph 10 of the agreements between Nedco and Canajoharie and Schoharie.

**5.** Approximately $10,000.00 of the Market Administrator's claim was granted priority status

as sums due for debtor's pro-rata share of the *administration expenses* provided for in Order No. 2. The remaining $85,449.81 of the claim was allowed as a general unsecured claim against the estate.

interpleader fund to the Court, or to whom the Court directs.

■ As the Court's analysis above has indicated, the only party due sums from Dellwood for delivery of the May and June milk is Nedco. Dellwood cannot be required to pay twice for the same milk. Dellwood's motion seeking relief from further liability is thus granted, and it shall pay over to Nedco the interpleader funds currently held on deposit. Similarly, to the extent not already made clear, the claims by those parties other than Nedco against Dellwood are dismissed.

■ Prior to disbursal to Nedco, Dellwood is to be reimbursed out of the interpleader funds for its reasonable attorney's fees and expenses. This is so as

> A disinterested and innocent stakeholder, who has been required to expend time and money to participate in a dispute not of its own making, and the outcome of which has no impact upon him, is entitled to costs and attorneys fees.

*Sparta Florida Music Group, Ltd. v. Chrysalis Records, Inc.*, 566 F.Supp. 321, 322 (S.D.N.Y.1983). Hence, Dellwood shall submit a recapitulation of its associated attorney fees and expenses to the Court for approval prior to disbursement; as Dellwood is aware, however, the "costs and attorneys fees incurred in contesting claims which arise in the ordinary course of business may not be transferred by invoking interpleader relief." *Id.; Travelers Indemnity Co. v. Isreal*, 354 F.2d 488, 490 (2d Cir.1965). Upon the Court's determination of the reasonable charges due Dellwood, the balance shall be disbursed to Nedco.

VIII. DELLWOOD'S MOTION FOR SUMMARY JUDGMENT AGAINST EASTERN FOR APRIL MILK

■ It is undisputed that Dellwood has already paid Nedco for milk which the former purchased from the latter in April, 1985. There is no question that the payment preceded any demand by Eastern for direct payment to it. It is clear Eastern billed only Nedco for milk it had been delivering to Dellwood since 1982. Eastern had never before sought payment from Dellwood, or informed Dellwood of its contention that Dellwood was primarily responsible for payment. Each month Dellwood was billed by Nedco; and each month Dellwood, pursuant to its contract with Nedco, paid Nedco for the milk it purchased, including that delivered by Eastern pursuant to that party's agreement with Nedco.

The Court believes that as a matter of law, Eastern is now estopped from seeking payment from Dellwood for the April milk, and that as indicated previously, Dellwood is entitled to summary judgment against Eastern on its cross-claim. As stated by United States Court of Appeals for the Second Circuit:

> The New York law of estoppel is that the duty to speak need not be a purely legal one, *Simmons v. Westwood Apartments Co.*, 46 Misc.2d 1093, 261 N.Y.S.2d 736, 740 (Sup.Ct. Onondaga Co.1965) *aff'd on other grounds*, 26 A.D.2d 764, 271 N.Y. S.2d 731, *appeal denied*, 18 N.Y.2d 786, 275 N.Y.S.2d 271 [221 N.E.2d 811] (1966), but rather may be founded in principles of ethics and good faith: when one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so to the ultimate prejudice of the other party, he will be estopped from relying thereafter on that relationship. *Cf. Armour & Co. v. Celic*, 294 F.2d 432, 437–38 (2d Cir.1961).

*Columbia Broadcasting System, Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 378 (2d Cir.1975). *See also Jonathan Woodner Co. v. Aetna Insurance Co.*, 442 F.2d 754, 757–58 (D.C.Cir.1971).

Certainly, Eastern continued in a set course of conduct with Dellwood for nearly three years, and only sought to alter the rules of the relationship when it discovered the precarious nature of its ability to receive payment from Nedco. Dellwood is not liable to Eastern for that which it has already properly paid Nedco.

 

IX. DELLWOOD'S MOTION TO JOIN CITICORP INDUSTRIAL CREDIT, INC.

Dellwood seeks to add Citicorp Industrial Credit, Inc. ("Citicorp") as a party defendant to these proceedings. There being no opposition, this motion is granted.

## PROPOSED ORDER

As a consequence of the foregoing, the Court proposes the following order:

ORDERED:

1. Nedco's motion for summary judgment on its claim against all defendants is granted.

2. Eastern's motion for summary judgment on its cross-claim against Dellwood is denied, and the cause of action dismissed.

3. Poland's motion for summary judgment on its cross-claim against Dellwood is denied, and the cause of action dismissed.

4. Hershey's motion for summary judgment on its cross-claim against Dellwood is denied, and the cause of action dismissed.

5. The Market Administrator's motion for summary judgment on its cross-claim against Dellwood is denied, and the cause of action dismissed.

6. Schoharie's motion for summary judgment on its cross-claim against Dellwood is denied, and the cause of action dismissed.

7. Canajoharie's motion for summary judgment on its cross-claim against Dellwood is denied, and the cause of action dismissed.

8. Dellwood's motion for summary judgment discharging it from further liability for the interpleader funds is granted. Dellwood shall forthwith submit to the Court a recapitulation of its attorney's fees and costs for approval. Upon rendition of an order approving reasonable attorney's fees and costs, Dellwood shall disburse the interpleader funds to Nedco, less the approved fees and costs.

9. Dellwood's motion for summary judgment on its cross-claim against Eastern respecting milk it purchased in April 1985, from Nedco, is granted.

10. Dellwood's motion to join Citicorp. Industrial Credit, Inc. as a party defendant is granted.